UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE
COMMISSION,
                              Plaintiff,                    Civil Action No. 1:26-CV-

        v.

ZAN SHAIKH AND BRIGHT VISION
DISTRIBUTION LLC, D/B/A MINING
AUTOMATIC,
                              Defendants.

COMPLAINT

        Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the

following against defendants Zan Shaikh ("Shaikh") and Bright Vision Distribution LLC, doing

business as Mining Automatic ("Mining Automatic" and collectively with Shaikh,

"Defendants"):

SUMMARY

        1.      This case involves the misappropriation and misuse of investor assets by Shaikh

and his company, Mining Automatic.  Defendants engaged in a fraudulent scheme and made

materially false and misleading statements in connection with their unregistered securities

offering relating to crypto asset mining.  Defendants' scheme promised investors guaranteed

monthly returns from investing in a purported crypto assets mining operation that was

insufficient to generate the promised returns.  In total, Defendants raised approximately $22

million from more than 380 investors between approximately June 2023 and May 2025 (the

"Relevant Period").  Approximately $15 million of that investment total came from new

investors and about $7 million of that investment total came from prior investments in one of

Shaikh's prior failed enterprises by investors who were persuaded to "roll over" their previous

investments into the Mining Automatic offering.

2.     As part of their scheme to defraud, Defendants issued securities to investors in the form of "Mining Automatic Agreements" ("Investment Agreements").  The Investment Agreements, typically signed by Shaikh on behalf of Mining Automatic and by each investor, generally provided that: (1) Mining Automatic would install crypto asset mining equipment at its locations for each investor, (2) the investor would pay Mining Automatic a fixed upfront dollar amount to generate returns from that crypto asset mining equipment; (3) the investor would receive 80% of the profits for a period of five years arising from the investor's specific portion of the mining operations and Mining Automatic would receive 20% of those profits; and (4) the investor's profits would be calculated and paid on a monthly basis.

3.     The Investment Agreements gave all managerial control and ownership of the crypto asset mining equipment to Mining Automatic.

4.     Many of the Investment Agreements guaranteed that investors would be paid a minimum monthly return on their investment (typically 3%).  Nearly all of the Investment Agreements also guaranteed that investors would be made whole at the end of the five-year Investment Agreement term if their total returns fell short of their original investment amount.

5.     As part of marketing the Investment Agreements, Defendants touted the safety of investors' capital from fluctuations in the crypto asset markets, contending that investors were investing in the underlying infrastructure rather than particular crypto assets whose prices could fluctuate.

6.     Despite Defendants' representations that they would use investors' funds to engage in crypto asset mining, Defendants pooled investors' contributions and used only about 13% of investors' funds on expenses relating to purported crypto asset mining.  Instead, they used investors' funds largely for marketing to solicit new investors and to pay for Shaikh's

2

personal and unrelated business expenses. Those personal expenses included real estate expenses, automobile purchases, lavish meals, luxury travel and luxury consumer goods.

7. In the course of soliciting investments, and lulling investors who were inquiring about why they were not receiving their promised monthly investment returns, Defendants made numerous materially false and misleading statements to investors. Defendants misrepresented: the uses of investors' money; their experience, expertise and track record in crypto asset mining; the functioning and status of their crypto asset mining operations; and the purported reasons why Defendants could not make monthly payments to investors when they were due.

8. Most investors received payments that Defendants claimed were either investment returns, or complimentary payments, for a period of several months. But by March 2025, Defendants had stopped making payments to investors.

9. Defendants' scheme has some of the hallmarks of a Ponzi scheme because some investors received payments that purported to be investment returns, but those "returns" were collectively more than the actual profits Defendants generated from purported crypto asset mining. Thus, a portion of these purported returns were financed by other investors' investments.

10. As of the date of this Complaint, Defendants have failed to repay over $20 million in investment principal to Mining Automatic investors. This sum does not account for the investment returns that Defendants promised to these investors and accounts only for investment principal.

11. As a result of the conduct alleged herein, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder [15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5]

3

and Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§77e(a), (c); §77q(a)].

12. Based on these violations, the Commission seeks from Defendants: (1) permanent injunctions enjoining them from engaging in the transactions, acts, practices, and courses of business of the type alleged in this Complaint in violation of the federal securities laws; (2) disgorgement of ill-gotten gains from the unlawful conduct set forth in this Complaint pursuant to Sections 21(d)(3), (5) and (7) of the Exchange Act [15 U.S.C. §78u(d)(3), (5), (7)], together with prejudgment interest; (3) civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)], and such other relief as the Court may deem appropriate. In addition, the Commission seeks orders prohibiting Shaikh from acting as an officer or director of certain public companies, and from participating in the issuance, purchase, offer or sale of securities, with certain exceptions.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to Sections 20(d)(1) and 22(a) of the Securities Act [15 U.S.C. §§77t(d)(1), 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C §§78u(d), 78u(e) and 78aa].

14. Venue is proper in this District pursuant to Section 22 of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C §78aa]. Defendant Mining Automatic is a Massachusetts corporation. Also, certain of the acts, practices, transactions and courses of business constituting the violations alleged in this Complaint occurred within the District of Massachusetts, and were effected, directly, or indirectly, by making use of the means or instrumentalities of transportation or communication in interstate commerce, or the mails, including the internet and the telephone.

4

15.    Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

## DEFENDANTS

16.    Zan Shaikh, age 28, currently resides in Miami, Florida.  During a portion of the Relevant Period, Shaikh worked from Massachusetts.  Shaikh is the president and founder of Mining Automatic and controls its business.

17.    Bright Vision Distribution LLC, which does business as Mining Automatic ("Mining Automatic"), is a Massachusetts corporation with a principal place of business in Marlborough, Massachusetts.  It was incorporated on July 24, 2018.  Shaikh is its owner.  Over time, Shaikh has operated several distinct businesses using the Bright Vision corporate form.

## FACTUAL ALLEGATIONS

18.    A "crypto asset" is a digital representation of value that is recorded on a cryptographically secured distributed ledger.  An example of a common crypto asset is Bitcoin.  Crypto asset "miners" are participants in a crypto network who provide computational resources to validate transactions on the network ("mining"), for which the miners may be rewarded with crypto assets.  The term "hashrate" refers to the computational power (measured in "hash" per second) at which computers solve cryptographic puzzles to validate transactions.

**Shaikh's Background**

19.    Before starting Mining Automatic in approximately June 2023, Shaikh formed, operated and abandoned several other businesses, which were promoted through marketing focused on generating quick profits.  These prior businesses included a training program to teach people how to start, and increase the visibility and search result ranking of, Amazon storefronts,

and a YouTube advertising business.  Some of these earlier businesses operated through the corporate form of Bright Vision.

20.    During the Relevant Period, Shaikh had a sizable social media following, and posted content that includes how to build wealth through marketing.  On one social media platform, Shaikh urged his followers to employ business strategies that "drive every conceivable penny" into their business's "marketing machine," which he referred to as an "infinite money glitch" or an "infinite money printer."  In another video that he posted in March 2023, Shaikh stated that if his followers adhered to this strategy, "you are really truly going to have limitless revenue.  Your issue will never be money again.  Your issue is going to be, alright how the hell do I deliver on this?  How do I make this happen?"

21.    Shaikh's Mining Automatic scheme had precisely this "issue."  Defendants intentionally, knowingly, or at least recklessly, failed to deliver on the promises they made to investors.

**Mining Automatic's Business**

22.    In about June 2023, Shaikh began soliciting investments for Mining Automatic, which advertised itself as a crypto asset mining company.  Defendants did not file a registration statement with the Commission for the offer and sale of the Investment Agreements.

23.    Mining Automatic's website represented that it offered investors the opportunity to obtain recurring passive income by relying on its expertise in crypto asset mining.  The website claimed that its "advanced operations," "cutting edge technology," and "exclusively-sourced, low-cost energy" enabled it to "deliver consistent returns" in a "future proof" and "secure" manner.  The website also claimed that Mining Automatic had obtained "annual returns" of 51.5% in 2021, 46.2% in 2022 and 51.8% in 2023.

24.    Mining Automatic's website also explained that it offered its services to investors as an "investment opportunity" (rather than just building and funding its mining operations itself with a bank loan) because it allowed the company to "scale rapidly while providing significant value to investors," and created meaningful relationships with investors that increased its network for future referrals.  The website also explained how Mining Automatic reduced investment risk by mining several different types of crypto assets, monitoring regulatory developments, and conducting efficient operations that relied on the company's expertise in selecting and maintaining its mining equipment.

25.    Mining Automatic further assured investors that they could rely on the firm's "8+ Years [of] crypto experience" and its management team's mining expertise, claiming that the "team that designed, built and maintains the mining system has over 30 cumulative years of experience and has worked for billion dollar companies in the mining and electricity space."

26.    Defendants had no factual basis to make many of these assertions.  Neither Shaikh nor many of the other Mining Automatic employees had any prior experience in crypto asset mining, and Mining Automatic was not in operation in 2021 or 2022 such that it had a track record from which "annual returns" could be calculated.

27.    Marketing materials published by Mining Automatic, primarily on social media outlets, emphasized the passive nature of the investment and the guaranteed nature of the return that investors were promised.  Examples include:

> a.   "This is a very hands off opportunity. Once your account is connected you just sit back and allow funds to be mined and sent to your account. This is a long term opportunity where we handle all of the configuration, optimization and ongoing management for you."

b. "Your investment ensures a guaranteed return percentage, offering a minimum of 3% monthly returns with the potential to earn up to 10%+, depending on market conditions. We commit to providing consistent returns throughout the duration of your agreement."

28. Many Mining Automatic investors decided to invest after seeing Mining Automatic advertisements on social media. After providing their contact information to the company, they were contacted by a Mining Automatic employee, or sometimes Shaikh, who arranged for the investor to sign an Investment Agreement and to wire the full investment amount to a Mining Automatic bank account that Shaikh controlled. Shaikh approved the form of those Investment Agreements and provided the information that at least one other Mining Automatic employee conveyed to investors.

29. To memorialize investors' investments, Mining Automatic provided investors with an Investment Agreement. The agreements were signed by Shaikh on behalf of Mining Automatic and by the investor. The terms of the agreements varied somewhat among investors, but generally had the following same key provisions: (i) Mining Automatic agreed to "install cryptocurrency mining equipment at its locations" and "to allow" the investor "to utilize the Equipment for the purpose of mining cryptocurrency;" (ii) the investor paid an upfront fee upon execution of the Agreement; and (iii) in exchange for that upfront fee, the investor would receive 80% and Mining Automatic would receive 20% of the profits "arising from" the investor's portion of the mining operations, which profits would be "calculated and paid on a monthly basis."

30. In addition, nearly all of the Investment Agreements included a "Guarantee" that the investor would receive back at least their complete initial investment. The Investment

8

Agreements promised to reimburse investors the difference between their upfront payments and the amount of revenue generated at the end of the five-year term of the Investment Agreement (or a lesser percentage if the investor terminated the contract early (50% reimbursement after 3 years and 75% reimbursement after 4 years)).

31.     Approximately half of the Investment Agreements specified the precise computational output to which investors were entitled in exchange for their investments, for a period of five years.  For example, one Investment Agreement stated that "Client shall pay [Mining Automatic] $100,000 USD ("the Service Fee") in advance for generation of 110,000 "megahashes" per second ("MH/s") for a set term of five years."

32.     About one-third of the Investment Agreements specified that investors would receive a minimum return on an ongoing basis.  For example, one Investment Agreement stated that "[a] minimum 3% monthly return will be generated on $100,000 [] and up to 10%+ monthly return for a set term of five years."

33.     The Investment Agreements also typically stated that Mining Automatic had complete control and ownership of the mining equipment.  For example, the Investment Agreements typically stated that Mining Automatic was responsible for: (i) selecting the particular type of equipment to be used for mining, the supplier of the equipment and the location where it would be installed; (ii) managing the operations of all mining equipment and infrastructure; and (iii) repairing and improving the mining equipment.  The Investment Agreements also specified that the mining equipment "is, and shall remain, the property of [Mining Automatic], and Client shall have no right, title or interest therein or thereto except as expressly set forth in this Agreement."

34.     Investors typically transferred their investment funds to Mining Automatic by wire transfer, to a Mining Automatic bank account controlled by Shaikh.

35.     To date, the Commission has identified approximately 380 investors, across numerous states, who collectively invested about $22 million with Mining Automatic during the Relevant Period.  Approximately 280 investors, who collectively invested about $15 million, made new investments in Mining Automatic.  Approximately 100 investors, who collectively invested about $7 million, had previously invested in another of Shaikh's earlier, abandoned businesses and were convinced by Shaikh or others acting at his direction to move their investments from the prior venture to Mining Automatic.

**Defendants Misrepresented the Uses of Investors' Funds.**

36.     Defendants' representations that investors' upfront payments would be used for mining crypto assets were, in many instances, false and misleading.  At the time they made these representations, Shaikh and Mining Automatic knew, or had reason to know, or were reckless in not knowing, that only a small portion of the money invested by their investors was or would be used to purchase, install and operate crypto asset mining equipment.

37.     In May 2023, Defendants or their affiliates contracted with a third party that to provide Defendants with crypto asset mining equipment and hosting services for that equipment ("Company A").  Between June 2023 and February 2025, Defendants paid Company A approximately $2.9 million – only approximately 13% of investors' funds – to purchase crypto asset mining equipment and for associated energy and hosting costs.

38.     In addition, rather than purchasing mining equipment that would be assigned to each investor, as the Investment Agreements represented, Defendants comingled all investor

10

funds in a single bank account and made bulk purchases of mining equipment that were not recorded as being assigned to particular investors.

39.     The crypto asset mining that Company A purported to conduct on Defendants' behalf generated approximately $1.1 million, which Company A sent to crypto asset wallets controlled by Shaikh.

40.     Moreover, while more than half of the Investment Agreements entitled the investors to a specific computational output (or hashrate) of mining power over the five-year term of the Agreements, Defendants had no mechanism to track whether the mining equipment they purchased from Company A was sufficient to generate that overall hashrate, or whether each investor was receiving returns from any particular hashrate, much less the returns from the particular hashrate that was specified the investor's Investment Agreement.  To the extent that investors received any returns at all, they thus received only a share of the pool of "returns" that Company A provided to Defendants.

41.     Rather than paying any investor the actual mining returns associated with a particular hashrate of mining power, Defendants made discretionary payments to some investors for several months.  These payments were typically a set percentage of the investor's initial investment amount – usually 3%.  These payments came from the overall profits that were purportedly generated by all of Mining Automatic's pooled crypto asset mining equipment.

42.     According to a former Mining Automatic employee, investors were not paid based on any output from crypto asset mining, but rather, based on their assignment to a "Cohort" based on what was promised to them in their Investment Agreements.  For example, "Cohort A" investors were to be paid monthly returns of 4%, whereas "Cohort B" investors were to be paid monthly returns of 3%.  In practice, however, Shaikh made decisions as to when and if

11

each investor was paid, and often paid investors who were complaining about not receiving their returns over those who were not.

43.     By early February 2025, however, Company A ceased all purported mining efforts on behalf of Mining Automatic, and Defendants ceased making any payments to investors by March 2025.

44.     In total, Mining Automatic investors were paid approximately $1.8 million in purported investment returns, or "complementary payments." These payments were made either through a payment service, or by transfers of crypto assets (usually Bitcoin) from wallets controlled by Shaikh to the investors' crypto asset wallets.

45.     Defendants' failure to track the implementation of the hashrates promised to many investors, as well as the very low percentage of investors' funds actually spent to engage in purported crypto asset mining activities, the limited returns from the purported mining activities that Defendants conducted through Company A, and the fact that payments to investors exceeded the amount generated by Defendants' mining activities conducted through Company A, demonstrate that the "returns" paid to some investors came from the investments made by other investors.

46.     Many Mining Automatic investors have not been paid their promised monthly returns and no Mining Automatic investors have been repaid their original investment amount. Based on the information available to the Commission, Defendants took in at least $20 million more in investments than they have repaid to investors.

**Actual Uses of Investors' Funds**

47.     Despite the fact that the Investment Agreements promised that investors' funds would be used to mine crypto assets, Defendants actually used the majority of investors' funds

12

on unrelated business and personal expenses of Shaikh.  Though the Investment Agreements stated that Defendants were entitled to 20% of the profits from the crypto asset mining financed by the investors, these unrelated business and personal expenses far exceeded the profits Defendants were entitled to retain (approximately $220,000).

48.    Despite promising to use investors' funds to engage in crypto asset mining, Defendants spent approximately $7 million of the $22 million in Mining Automatic investments on marketing and advertising efforts to attract new investors.  Defendants also spent about $500,000 of investors' money on Shaikh's unrelated business ventures.

49.    In addition, Defendants spent significant sums from the investor funds through bank accounts and on credit cards on personal expenses for Shaikh, including real estate charges ($375,575), entertainment ($76,547), a car dealership ($151,750), and cash withdrawals ($118,585).  Defendants also transferred $778,550 to bank accounts owned by Shaikh.

**Defendants Engaged in Lulling Statements and Conduct.**

50.    Defendants made numerous false and misleading statements to investors to lull them into believing that their investments were safe and that they would be repaid.

51.    For example, Investor 1, an Army servicemember, invested $25,000 with Mining Automatic in October 2024 after clicking on a Mining Automatic social media advertisement. Investor 1's Investment Agreement guaranteed him a "minimum monthly 3% return on $25,000 [] and up to a 10%+ monthly return for a set term of five years."  Investor 1 received a single payment from Mining Automatic of his investment returns in February 2025.  The payment was made in Bitcoin with the approximate value of $63 at the time, or a return of .25% rather than the promised 3%.  When Investor 1 asked a Mining Automatic employee why he did not get the promised return, he was told that the .25% was a "complementary payout" because there was a

transition to newer mining equipment that caused a "timeline change" and was then told that "mining output hasn't reached the monthly threshold required for your five-year term to begin" and that he would continue to get "complementary" payments that did not count towards his contractually agreed returns until mining performance improved. On information and belief, there was no upgrade of mining equipment during this time period that would have affected mining performance. In March and April 2025, Investor 1 was informed that Shaikh was liquidating Mining Automatic and that Investor 1 would be repaid his investment amount plus some additional money. Investor 1 did not receive any of these promised payments.

52.     Shaikh distributed to other investors, in April 2025, a video in which he claimed that Mining Automatic was being "acquired" by "one of the much bigger players in the space" who wanted "to scoop it up as soon as possible" and that investors would be made whole along with additional payments. At the time he made these statements, Shaikh knew, or was at least reckless in not knowing, that they were false and that Mining Automatic was not being acquired by another company. At the time he made these statements, Shaikh also knew, or was reckless in not knowing, that Defendants did not have sufficient funds to repay Mining Automatic investors. Defendants did not, in fact, repay these other investors' investments.

53.     At around the same time that Shaikh was telling investors that Mining Automatic was in the process of being liquidated or acquired, he began pitching a new investment opportunity to provide them with the cash flow they had been expecting from Mining Automatic through a purported automated trading system that could generate returns without putting any of the investor's own capital at risk. Shaikh claimed that investors who signed up with this new company were receiving a "$50,000 in value offer - we're going to be giving it to you for free."

14

## FIRST CLAIM FOR RELIEF
## FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES

### Defendants' Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

54.    Paragraphs 1 through 53 above are re-alleged and incorporated by reference as if fully set forth herein.

55.    By reason of the conduct described above, Defendants, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly, or recklessly, (i) employed devices, schemes, or artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

56.    By reason of the conduct described above, Defendants violated Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R §240.10b-5] thereunder.

## SECOND CLAIM FOR RELIEF
## FRAUD IN THE OFFER OR SALE OF SECURITIES

### Defendants' Violations of Section 17(a) of the Securities Act

57.    Paragraphs 1 through 53 above are re-alleged and incorporated by reference as if fully set forth herein.

58.    By reason of the conduct described above, Defendants, directly or indirectly, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce

15

or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly, or negligently: (i) employed devices, schemes, or artifices to defraud; (ii) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; or (iii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

59.    By reason of the conduct described above, Defendants violated Securities Act Section 17(a) [15 U.S.C. §77q(a)] and will continue to violate that section unless enjoined.

## THIRD CLAIM FOR RELIEF
## UNREGISTERED OFFERINGS OF SECURITIES

**Defendants' Violations of Sections 5(a) and 5(c) of the Securities Act**

60.    Paragraphs 1 through 53 above are re-alleged and incorporated by reference as if fully set forth herein.

61.    By reason of the conduct described above, Defendants directly or indirectly: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been filed and for which no exemption from registration has been available.

62.    As a result, Defendants violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§77e(a), (c)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

A.      Permanently restrain Defendants, their agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal services or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R §240.10b-5] by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security: (a) to employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of a material fact, or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person by, directly or indirectly, (i) creating a false appearance or otherwise deceiving any person, or (ii) disseminating false or misleading documents, materials, or information or making, either orally or in writing, any false or misleading statement in any communication with any investor or prospective investor, about: (A) any investment strategy or investment in securities, (B) the prospects for success of any product or company, (C) the use of investor funds, (D) compensation to any person, (E) Defendant's qualifications; or (F) the misappropriation of investor funds or investment proceeds;

B.      Permanently restrain Defendants, their agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal services or otherwise, and each of them, from violating Section 17(a) of

17

the Securities Act [15 U.S.C. §77q(a)], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in the offer or sale of any security: (a) to employ any device, scheme, or artifice to defraud; (b) to obtain money or property by means of any untrue statement of a material fact, or any omission of a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser by, directly or indirectly, (i) creating a false appearance or otherwise deceiving any person, or (ii) disseminating false or misleading documents, materials, or information or making, either orally or in writing, any false or misleading statement in any communication with any investor or prospective investor, about: (A) any investment strategy or investment in securities, (B) the prospects for success of any product or company, (C) the use of investor funds, (D) compensation to any person, (E) Defendant's qualifications; or (F) the misappropriation of investor funds or investment proceeds;

C.      Permanently restrain Defendants, their agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal services or otherwise, and each of them, from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§77e(a), (c)];

D.      Enter an order barring Shaikh from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Shaikh from purchasing or selling securities for his own personal accounts;

E.      Enter an order barring Shaikh from serving as an officer or director of any issuer

that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. §78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. §78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. §77t(e)] and 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)];

F.      Order Defendants to disgorge, with prejudgment interest, their ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint, pursuant to Section 21(d)(3), (5) and (7) of the Exchange Act [15 U.S.C. §78u(d)(3), (5), (7)];

G.      Order Defendants each to pay an appropriate civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)];

H.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

I.      Grant such other further relief as the Court may deem just and proper.

## JURY DEMAND

The Commission demands a jury in this matter for all claims so triable.

DATED: July 20, 2026

Respectfully submitted,

/s/ Kathleen Burdette Shields
Kathleen Burdette Shields (BBO# 637438)
Joy Guo (NY Bar # 5294764)
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA 02110
Phone: (617) 573-8904 (Shields direct)
(617) 573-4534 (Guo direct)
(617) 573-4590 (fax)
ShieldsKa@sec.gov (Shields email)
GuoJ@sec.gov (Guo email)